UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | File No. 19-cr-157 (WMW/LIB) (1) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Courtney John Barrett, Jr., | |
| Defendant. | |

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of 28 U.S.C. § 636 and Local Rule 72.1, upon Defendant Courtney John Barrett, Jr.'s (hereinafter "Defendant") Motion to Suppress Statements, Admissions, and Answers. [Docket No. 38]. The Court held a Motions Hearing on July 24, 2019, regarding the parties' pretrial Motions.[1] At the Motions Hearing, the parties requested the opportunity to submit supplemental briefing. The undersigned granted that request for supplemental briefing, which was completed on August 16, 2019, and after which Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 38], was taken under advisement.

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 38], be **DENIED**.

**I.   Background and Statement of Facts**

   **A. Background**

Defendant is charged with one count of robbery, in violation of 18 U.S.C. §§ 2, 1151, 1153(a), and 2111. (Indictment [Docket No. 1]).

---

[1] The Court addressed the parties' pretrial motions for discovery and production of evidence by separate Order. [Docket No. 66].

**B. Facts**

The record presently before the Court indicates that in May 2019, Federal Bureau of Investigation Special Agent Kyle Gregory (hereinafter "SA Gregory") became involved in the investigation of the May 1, 2019, robbery of the "Snack Shack" store in Red Lake, Minnesota, on the Red Lake Indian Reservation. (July 24, 2019, Motions Hearing, Digital Recording at 11:11–11:13). SA Gregory became involved in the investigation of the robbery approximately a week after it occurred. (Id. at 11:13–11:14).

When he became involved in the investigation, SA Gregory was informed that the robbery had been conducted by two masked men who, based on previously received witnesses' statements, law enforcement believed to be Defendant and co-Defendant, Robert Lee Jourdain, Sr. (Id. at 11:13–11:14). Upon learning the believed identification of the suspected individuals, law enforcement began searching for Defendant. (Id. at 11:14–11:15).

At approximately 2:00 p.m. on May 28, 2019, Defendant was arrested. (Id. at 11:14–11:16). Upon his arrest, he was taken into custody by Red Lake Police officers, and he was transported to the Red Lake jail and Police Department building. (Id. at 11:14–11:17).

Following Defendant's arrest, SA Gregory and Red Lake Criminal Investigator John Richards (hereinafter "CI Richards") went to the conference room at the Red Lake Police Department. (Id. at 11:15–11:17). The conference room contains a large table, between ten and fifteen chairs, two doors, and a wall that is made up of windows to the outside. (Id. at 11:16–11:18). SA Gregory and CI Richards then called the Red Lake jail to request that Defendant be brought to the conference room. (Id.).

Defendant was then brought to the conference room. (Id.). SA Gregory and CI Richards sat on the far side of the table with their backs to the window. (Id.). Defendant was placed on the

side of the table nearest the two doors. (Id.). Defendant was initially handcuffed while being transported to the conference room; however, CI Richards removed handcuffs when Defendant entered the conference room. (Id.).

SA Gregory recorded the entirety of the conversation with Defendant. (Id. at 11:17–11:19).

SA Gregory begins the interview by introducing himself to Defendant. (Def.'s Ex. 1 at 00:00–1:40).[2] SA Gregory then noticed that Defendant was walking with a limp, (July 24, 2019, Motions Hearing, Digital Recording at 11:20–11:21), which caused SA Gregory to inquire as to whether or not Defendant was "alright." (Def.'s Ex. 1 at 00:39–1:40). Defendant said he had a "rash" from a tick-bite, and he had been given a cream to use when it was painful; however, he was unaware of the location of the cream because it was not located in his sweater where he had believed it was located. (Id.).

SA Gregory then continued the interview by telling Defendant that because he was in custody, he would be read an Advise of Rights form. (Id. at 1:39–1:45). SA Gregory also explained to Defendant why the officers were speaking to Defendant. (Id.). Specifically, SA Gregory stated, "we know what happened," and he told Defendant that the interview was his opportunity to tell his side of the story. (Id. at 1:40–2:40).

The following exchange then took place:

**SA Gregory**: This is your Advice of Rights, so if you could just say that you know or understand what I say, just give me a verbal yes as we go through.

[Reading from Advice of Rights form] Before we ask you any questions, you must understand your rights.

---

[2] Defense Exhibit 1 is a CD audio recording of the first eight minutes and fifty-eight seconds of the May 28, 2019, interview. Although the interview lasted approximately ninety minutes, the parties agreed that only the first eight minutes and fifty-eight seconds were relevant to the present Motion, and the parties did not wish to introduce the remainder of the interview into evidence. Upon the agreement of the parties, Defense Exhibit 1 was provided to the Court along with Defendant's memorandum in support of the present Motion.

[Pause]

You understand that?

**Defendant**: Yes.

**SA Gregory**: [Reading from Advice of Rights form] You have the right to remain silent.

**Defendant**: Yes.

**SA Gregory**: [Reading from Advice of Rights form] Anything you say can be used against you in court.

**Defendant**: Yes.

**SA Gregory**: [Reading from Advice of Rights form]You have the right to talk to a lawyer for advice before we ask you any questions.

**Defendant**: Yes.

**SA Gregory**: [Reading from Advice of Rights form] You have the right to have a lawyer with you during questioning.

**Defendant**: Yes.

**SA Gregory**: [Reading from Advice of Rights form] If you cannot afford a lawyer, one will be appointed to you before any questioning if you wish.

**Defendant**: Yes.

**SA Gregory**: [Reading from Advice of Rights form] If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

**Defendant**: K. I mean,

**SA Gregory**: Can you just read this consent paragraph out loud.

**Defendant**: [Reading from Advice of Rights form] I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions with a lawyer present.

**SA Gregory**: Is that true? You want to talk to us? Like it says, at any point you want to stop, we can stop, but we want to get your side of the story if you are willing to talk to us.

**Defendant**: I was told to wait 'til I had a lawyer.

**SA Gregory**: That's up to you. I am not sure who told you that. It is up to you if you want to have a lawyer present or not.

**Defendant**: I don't know; John, what do you think?

**CI Richards**: Whatever you do it's your decision.

**SA Gregory**: Unfortunately we can't give you any legal advice.

**CI Richards**: Yeah, that's right.

**SA Gregory**: Like I said we know what happened so if you don't want to talk that's fine, but I wanted to give you an opportunity to tell your side of the story. There are going to be federal charges in this case. And so what happens is you will be charged, you will be indicted federally and at that point I work with the United States Attorney's Office. And so I can either go to them and say look Courtney owned up to it, he was a man about it, he let us know what happened, he told the truth, and I can't guarantee anything but they will put that forward to the Judge who decides sentencing and all that stuff, and it helps people out, they get less sentences, less time, or I can go back and say you didn't want to talk and we go forward that way. It's up to you.

**Defendant**: So its going to be federal charges?

**SA Gregory**: Yep, it will be federal charges.

**Defendant**: If I talk its going to be federal charges?

**SA Gregory**: Yeah, either way there's federal charges.

**Defendant**: Um. Oh. So I'm looking at some prison time?

**SA Gregory**: That all depends. I can't say. I can say that in my experience cooperating, telling the truth from the start helps out with that.

**Defendant**: Mm.

**SA Gregory**: But I can't guarantee you there won't be prison time or anything like that.

**Defendant**: Ok. I just don't want my name to be—you know like all out. People read paperwork out there in the street, I don't want to be labelled as a rat because then I have to worry people fuckin' with me and my family and shit.

**SA Gregory**: Yeah.

**Defendant**: Yeah. Is there a way to keep my name blackout or something?

**SA Gregory**: Um, I can tell you that at this point the conversation will stay between us. Down the road it will be in court, it will be in court records so I don't think people check those normally, but I can't guarantee that it won't get out. It wouldn't get out for a while at least. And it won't be us releasing it. It will have to be someone going into court and asking for the records as far as I'm aware.

**CI Richards**: But we don't release any names where, Courtney told us this, Courtney told us that, we don't do that, that's just not how we operate.

**Defendant**: Are you sure John?

**CI Richards**: Yeah, Yeah, that's how we operate. You know, I mean our jobs are to gather facts, and facts only. We don't tell names to anybody. It stays between me and him.

**SA Gregory**: Yeah, it's just us three.

**CI Richards**: And that recording . . .

**SA Gregory**: Yeah, this stays with the FBI. Everything goes back to the FBI office. John will know because he is working it from Red Lake side but it's essentially going to be a federal case and so it's all going to be federal paperwork, it won't be in this office.

**Defendant**: I tell you that because there is a lot of paperwork from up here that gets leaked into the street.

**SA Gregory**: Mm.

**Defendant**: From employees up here.

**SA Gregory**: And this recording won't be in this office. I'm going to bring it back to the FBI office. Anything I write up; all my case work is at the FBI office in Bemidji. It's not up here.

**Defendant**: Yeah, I guess then.

**SA Gregory**: You're willing to talk?

**Defendant**: Yeah.

**SA Gregory**: Alright.

**Defendant**: But I can stop whenever I want?

**SA Gregory**: Yep, at any point.

(Id. at 2:40–8:18). Defendant then signed the Advice of Rights form, and the form was witnessed by SA Gregory and CI Richards. (Id. at 8:18–8:56; Gov't Ex. 2).[3]

SA Gregory testified that the interview lasted approximately ninety (90) minutes. (July 24, 2019, Motions Hearing, Digital Recording at 11:24–11:26). SA Gregory also testified that throughout the interview Defendant responded appropriately to questions presented, and Defendant appeared to understand the circumstances. (Id. at 11:20–11:22).

Throughout the recorded interview, SA Gregory and CI Richards can be heard maintaining a conversational tone without raising their voices to yell or threaten Defendant. Defendant likewise maintained a conversational tone, and he was cooperative throughout the portion of the interview provided to the Court. Defendant can also be heard responding appropriately to the questions presented.

**II.   Defendant's Motion to Suppress Statements, Admissions, and Answers. [Docket No. 38].**

Defendant now moves the Court for an Order suppressing the statements he made to SA Gregory and CI Richards on May 28, 2019. (See, Def.'s Mot. to Suppress Statements, Admissions, and Answers [Docket No. 38]).

---

[3] Government's Exhibit 2 is a copy of the Advice of Rights form signed by Defendant and witnessed by SA Gregory and CI Richards on May 28, 2019. At the Motions Hearing, the Government, without objection, offered the Advice of Rights form into evidence as Government's Exhibit 2. (July 24, 2019, Motions Hearing, Digital Recording at 11:21–11:22).

In support of the present Motion, Defendant originally contended that law enforcement was required to provide him with a Miranda[4] warning before interrogating him, and that he did not voluntarily provide a knowing and intelligent waiver of his rights prior to interrogation. (See, Id.). At the July 24, 2019, Motions Hearing , however, Defendant, through counsel, withdrew his argument that the purported Miranda waiver was involuntary. (July 24, 2019, Motions Hearing, Digital Recording at 11:08–11:12; see, Def.'s Mem. [Docket No. 69]). Defendant maintains that his purported Miranda waiver was not knowing and intelligent. Therefore, Defendant argues, the statements he made on May 28, 2019, should be suppressed. (Def.'s Mem. [Docket No. 69]).

### A. Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). "Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (quoting Rhode Island v. Innis, 466 U.S. 291, 300–01 (1980)). Whether an incriminating response is sought by an officer is determined "from the perspective of the

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

8

suspect" and not by the officer's actual intent. United States v. Richardson, 427 F.3d 1128, 1132 (8th Cir. 2005).

A defendant may waive their rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

### B. Analysis

It is undisputed that law enforcement's express questioning of Defendant on May 28, 2019, constituted interrogation. It is also undisputed that Defendant was in custody during the May 28, 2019, interview when he made the statements he now seeks to suppress. (See, Gov't's Response to Def.'s Mot. to Suppress Statements [Docket No. 70]). The record also clearly demonstrates that Defendant was read a Miranda warning before the interview began, and he both verbally and in writing acknowledged he understood the rights warning. The Advice of Rights form signed by Defendant represents a waiver of those rights.

Accordingly, the only issue now before the Court regarding Defendant's May 28, 2019, interview is whether Defendant's waiver of his rights was made knowingly and intelligently.

Before a statement procured through custodial interrogation can be admitted in court, the Government must demonstrate that a defendant's wavier of his rights was made intelligently, knowingly, and voluntarily. Miranda, 384 U.S. at 444, 475. The validity of a Miranda waiver requires consideration of two distinct inquiries, namely whether the waiver was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and whether the waiver was knowingly and intelligently made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "The government has the

9

burden of proving the validity of the Miranda waiver by a preponderance of the evidence." United States v. Haggard, 368 F.3d 1020, 1024 (8th Cir. 2004).

### 1. Voluntariness[5]

Courts assess whether a waiver of rights pursuant to Miranda was made voluntarily by considering "the conduct of law enforcement officials and the suspect's capacity to resist any pressure." United States v. Contreras, 372 F.3d 974, 978 (8th Cir. 2004). The United States Supreme Court has previously explained "that coercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary,'" Colorado v. Connelly, 479 U.S. 157, 167 (1986), and the Eighth Circuit has read that holding to mean "that police coercion is a necessary prerequisite to a determination that a waiver was involuntary and not as bearing on the separate question whether the waiver was knowing and intelligent." United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (quoting United States v. Bradshaw, 935 F.2d 295, 299 (D.C. Cir. 1991)).

In determining whether a waiver was made voluntarily, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." United States v. Syslo, 303 F.3d 860, 866 (8th Cir. 2002). In considering the totality of the circumstances, a court reviews whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." United States v. Sanchez, 614 F.3d 876, 883 (8th Cir. 2010) (internal quotation marks and citations omitted). "More specifically, [a court] consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its

---

[5] Although Defendant does not argue that his Miranda waiver was made involuntarily, Defendant does argue that his Miranda waiver was ultimately invalid, and therefore, the Court, in an abundance of caution, will address the voluntariness of said waiver.

10

continuity, and the defendant's maturity, education, physical condition, and mental condition." Id. (citing Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004)).

In the present case, Defendant does not point to any particular factor which renders involuntary his May 28, 2019, rights waiver pursuant to Miranda. Defendant offers no specific argument that SA Gregory or CI Richards engaged in any specific coercive tactics that caused Defendant's will to be overborne during the interview. In fact, the Court's independent review of the provided audio recording of the May 28, 2019, interview indicates that the officers did not engage in any coercive tactics. See, United States v. Mims, 567 F. Supp. 2d 1059, 1080 (D. Minn. 2008) (holding Miranda waiver voluntary where, among other factors, interview was conducted in a reasonable, conversational tone); see also, United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (concluding no coercive tactics were used where, among other things, officers made no threats or promises to the defendant). The Court's independent review of the provided portion of the audio recording of the May 28, 2019, interview indicates that the officers made no threats or promises to Defendant in exchange for Defendant's waiver of his rights pursuant to Miranda. Further, the Court's review of the provided recording of the interview with SA Gregory and CI Richards shows that Defendant spoke willingly and non-defensively with the officers, understood what was being asked of him, and responded appropriately to the question presented. Moreover, Defendant's counsel specifically stated that Defendant was waiving his argument that his waiver of his Miranda rights was involuntary. (July 24, 2019, Motions Hearing, Digital Recording at 11:08–11:12).

Finally, the interview, which SA Gregory testified lasted approximately ninety minutes, was also not coercive in its duration. See, e.g., United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (noting that interrogation lasting more than two hours was not coercive in

11

duration); Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) (finding six-hour interview did not render confession involuntary).

Based on the foregoing, and under the totality of the circumstances, the Court concludes that Defendant's waiver of his rights on May 28, 2019, was voluntary.

2. Knowing and Intelligent

Next, the Court must consider whether Defendant's waiver of his rights was knowingly and intelligently made. Vinton, 631 F.3d at 483. The evidence in the record regarding Defendant's understanding of his rights and presence of mind during the May 28, 2019, interview consists of the provided position of the audio recording of the SA Gregory and CI Richards interview, as well as, the motions hearing testimony of SA Gregory.

Defendant contends his waiver was not knowingly and intelligently made "due to the coercive nature of the 'waiver' and overall circumstances of the encounter." (Def.'s Mem., [Docket No. 69], at 1). Specifically, Defendant asserts these circumstances are demonstrated because he "starts out by asserting his right to counsel, and thereafter [he] hesitates throughout the inquiry, continuously expressing his concerns about talking to the agents, and has to be persuaded to sign the rights form and talk." (Id. at 3).[6]

The Court finds that on the present record, the Government offers sufficient evidence related to the May 28, 2019, recorded interview of Defendant by SA Gregory and CI Richards for the Court to determine that Defendant's waiver of his rights prior to that interview was knowing and intelligent. Defendant's characterizations of the record, however, is not supported by the record now before the Court.

---

[6] Although Defendant's arguments here appears to be more akin to an argument that his waiver was not voluntary, he argues that the cited facts demonstrate that his waiver was not knowingly and intelligently made. (See, Id. at 1; July 24, 2019, Motions Hearing, Digital Recording at 11:08–11:12).

12

On the record now before the Court, considering the totality of the circumstances, during the May 28, 2019, recorded interview by SA Gregory and CI Richards, Defendant fully comprehended the nature and scope of the conversation during the May 28, 2019, interview; understood the circumstances of the situation; understood the questions being asked of him; and provided contextually appropriate answers to questions presented. Defendant's coherency, understanding, and comprehension of the situation were demonstrated when he discussed his concern of persons on the "street" learning that he had spoken with law enforcement, as well as, Defendant's verifying that he could halt speaking with law enforcement any time he wished even if he started doing so. Defendant's demeanor during the interview remained responsive and cooperative.

Moreover, the provided portion of the audio recording for the May 28, 2019, interview further shows that after SA Gregory read aloud each line of the Miranda warning on the Advice of Rights form and Defendant verbally affirmatively acknowledged that he understood each line of the Miranda warning on the Advice of Rights form, SA Gregory handed Defendant a printed copy of the Miranda warning to review and allowed Defendant time to review the written Miranda warning. Then, after having already verbally indicating that he understood the rights read to him and having presented questions to the officers about those rights, Defendant signed the Advice of Rights waiver form before SA Gregory began actually interviewing Defendant. The signing of such a form "carries a significant weight in determining whether his waiver was knowing and intelligent." United States v. Gallardo, 495 F.3d 982, 991 (8th Cir. 2007) (citing North Carolina v. Butler, 441 U.S. 369, 373 (1979)).

The weight to be given to Defendant signing this Advice of Rights form is bolstered by the fact that SA Gregory read aloud the rights on the form to Defendant before handing him the

13

form, and as already indicated, that Defendant not only signed the form but also verbally indicated that he understood the rights SA Gregory had read aloud before voluntarily answering any questions. Even if Defendant had not signed the form, his actions—of answering questions cooperatively—after verbally acknowledging that he understood his rights and after he was given time to review the form imply that he understood his rights and he waived those rights. See, Butler, 441 U.S. 369 (holding that a waiver of rights pursuant to Miranda need not be explicit but may be inferred from the actions and words of a person being interrogated and such a waiver "is usually strong proof of the validity of that waiver").

Defendant's assertion that his waiver was not knowingly and intelligently made because he "starts out [the interview] by asserting his right to counsel, and thereafter [he] hesitates throughout the inquiry, continuously expressing his concerns about talking to the agents, and has to be persuaded to sign the rights form and talk," (Def.'s Mem., [Docket No. 69], at 1–3), is mitigated by the record now before the Court, including the portion of the May 28, 2019, recorded interview Defendant provided to the Court.

During the May 28, 2019, interview Defendant stated that he "was told to wait 'til [he] had a lawyer." When a defendant unequivocally states that he "wants an attorney, the interrogation must cease." Maryland v. Shatzer, 559 U.S. 98, 104 (2010). Despite Defendant's assertion to the contrary, Defendant did not unequivocally assert his right to counsel. See, Id.; United States v. Kouayara, 189 F. Supp. 3d 835, 845 (D. Minn. 2016).

Rather, Defendant said he had been told (by some unnamed person) he should wait for a lawyer, and SA Gregory told Defendant that was his decision. Defendant never affirmatively asked for a lawyer to be present during questioning. See, United States v. Kouayara, 189 F. Supp. 3d 835, 845 (D. Minn. 2016) (finding that the statement "I would like a lawyer to be

present" was valid, unequivocal invocation of a defendant's right to counsel). It was Defendant who then went on by asking CI Richards and SA Gregory questions. SA Gregory and CI Richards then responded to Defendant's questions. Defendant did express some concern about talking with law enforcement such as persons on the "street" discovering he had talked with law enforcement, and SA Gregory and CI Richards responded to those concerns. Defendant also asked questions about the type of charges that would be placed against him, and SA Gregory explained how that process would work and that it would likely be federal charges. Statements such those Defendant made here do not represent an unequivocally assertion to a right to counsel. See, Id.

However, neither SA Gregory nor CI Richards made any inquiry of Defendant regarding the robbery under investigation until <u>after</u> Defendant stated he would talk with them. Nothing in the record now before the Court indicates that Defendant was coerced into signing the Advice of Rights form.[7]

Therefore, under the totality of the circumstances—including the consideration of Defendant's own actions and words—the Court concludes that Defendant's waiver of his rights prior to the interview by SA Gregory and CI Richards on May 28, 2019, was both knowing and intelligent.

Thus, the Court recommends **DENYING** Defendant's Motion to Suppress Statements, Admissions, and Answers. [Docket No. 38].

---

[7] The Court observes that in response to SA Gregory's inquiry into Defendant's wellbeing, Defendant did state that he was experiencing pain due to a rash, however, the assertion of experiencing pain alone does not demonstrate that a Defendant's will is overborn or prevent a waiver of rights from being knowing and intelligent. United States v. Allen Class, No. 15-cr-375 (PJS/TNL), 2016 WL 3512140, at *4 (D. Minn. June 22, 2016) aff'd sub nom., United States v. Class, 883 F.3d 734 (8th Cir. 2018). Moreover, in the present case, SA Gregory inquired into whether or not Defendant's topical cream for his rash was immediately required. Although Defendant did not specifically respond to the inquire into whether or not he immediately needed his cream, he discussed that he did not know the location of the cream because he thought it was in his sweater. Further, Defendant never again noted that he was experiencing any pain, and he later agreed to speak with law enforcement.

### III. Conclusion

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT** Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 38], be **DENIED**.

Dated: September 16, 2019  s/Leo I. Brisbois
Hon. Leo I. Brisbois
U.S. MAGISTRATE JUDGE

### N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.